**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | No. 20-cv-1360 (SRN/KMM) |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION** |
| Marcus Anthony Berry, | |
| Respondent. | |

The United States filed a petition seeking the commitment of Marcus Anthony Berry pursuant to 18 U.S.C. § 4246. (Pet., ECF 1.) The Court held an evidentiary hearing, at which Dr. Melissa Klein, Ph.D, testified, and both sides have submitted post-hearing memoranda. (ECF 22 ("Tr."); ECF 24, 26 (memoranda).) After carefully reviewing the entire record in this matter, and for the reasons that follow, the Court concludes that Mr. Berry should be committed to the custody of the Attorney General for continued hospitalization and treatment until suitable state placement may be found or until his release no longer presents a substantial risk of bodily injury to another person or serious damage to the property of another. Therefore, the Court recommends that the government's petition be granted.

**I.   Background[1]**

Mr. Berry was born in Washington DC in 1995. (ECF 2 at 3.) He lived with both his mother and father until he was 12, when they separated, and he described his family as a close

---

[1] The record in this case includes the government's initial petition and its supporting exhibits (ECF 1), the complete Bureau of Prison's Medical and Central Files, and the risk assessment report (ECF 2). In addition, prior to the hearing, the parties highlighted specific excerpts from Mr. Berry's medical and central files. (ECF 17, exhibits 1-17.) The transcript will be cited as "Tr. __." (ECF 22.) Although Mr. Berry notes some hyperbole in the government's
*(footnote continued on following page)*

1

and loving one. He is particularly close to his mother, who supports him and wants him to come home. He also maintains a relationship with his father, with whom he stayed on occasion after his parents' separation. Mr. Berry's mother reports that his father was verbally abusive with temper issues during his childhood. She has also described Mr. Berry's father as suffering from his own serious mental illness.

**Childhood Struggles**

Mr. Berry has struggled with emotional health, cognitive impairment, and mental illness in some form for many years. According to his mother, he was first diagnosed with depression as a child, although he did not receive medication for that condition. (ECF 2 at 4.) Mr. Berry also experienced significant behavioral issues as a child and adolescent, receiving discipline at school, being repeatedly suspended, and eventually being placed in a juvenile facility. He struggled with impulse control and got into fights. He was first charged with juvenile offenses when he was 15, including serious felonies (ECF 2 at 15–16), although some of the most serious charges were dismissed by the court without conviction.

In addition, Mr. Berry experienced learning difficulties as a child. (ECF 2 at 4.) He was held back for second and ninth grades and was placed in special education. While available records from his schools were sparse, he was evaluated in 2011 because of his juvenile charges and determined to have borderline intellectual functioning. In 2014, after more complete testing, this diagnosis was confirmed, and Mr. Berry was found to have difficulty comprehending information regardless of whether he received it orally or in writing. (ECF 2 at 4.) His full-scale IQ was determined to be 72.

---

brief, there is no meaningful dispute about Mr. Berry's factual background, treatment history, or conduct while in custody.

**The Underlying Offense**

Mr. Berry was arrested for the offense underlying his most recent sentence in January, 2012, when he was 16. As summarized by the risk assessment (ECF 2 at 16), Mr. Berry "touched and kicked" a girl on the buttocks while she walked to a bus stop. She told her family, and her mother and brother came to confront Mr. Berry. He pointed a gun at the brother and began shooting, with several shots hitting the brother in the leg. Mr. Berry continued to walk toward the brother and shoot as the brother crawled away. When the girl's mother tried to help, she was also shot in the leg. Mr. Berry ran away and was later captured. The mother is now wheelchair bound because of this offense. Mr. Berry was charged as an adult.

Mr. Berry's behavior between his arrest in 2012 and his ultimate sentencing four years later was marked by instability and violent and threatening conduct. Between March 2012 and July 2015, Mr. Berry went back and forth between the D.C. Jail, where he was detained pending trial, and Saint Elizabeth's Hospital, where he was evaluated several times to determine whether he was competent to be tried at all. (ECF 2 at 6–9.) During these years, Mr. Berry was alternately found competent and incompetent to stand trial on several occasions. (ECF 2 at 6–7.) And during the later parts of 2014 and into 2015, he "engaged in a series of verbally, physically, and sexually inappropriate behaviors." (ECF 2 at 7; *see also* Tr. at 35; ECF No. 17-6 at 174–75 (summary of behaviors at Saint Elizabeth's Hospital); ECF No. 17-6 at 193 (same).)

For instance, when he was admitted to Saint Elizabeth's Hospital on October 6, 2014, Mr. Berry stated that he had been involved in several altercations while in the D.C. Jail. (ECF No. 17-6 at 187.) On December 9, 2014, and January 2, 2015, Mr. Berry was involved in "verbal altercation[s]" with peers at Saint Elizabeth's Hospital. (ECF 2 at 7.) On January 21, 2015, while waiting in line for a meal, another patient pushed Mr. Berry and hit him on the chin, which led

3

Mr. Berry to retaliate by punching the other patient in the face. (ECF 2 at 7, 16–17.) Neither Mr. Berry nor the other patient were seriously injured, and Mr. Berry was "receptive to counseling about this incident." (ECF 2 at 7.) Nine days later, however, Mr. Berry was involved in another physical altercation with a peer in the Therapeutic Learning Center ("TLC") at Saint Elizabeth's. This incident was the result of a disagreement over clothing that Mr. Berry had lent to another patient. (ECF 2 at 7, 17; Tr. at 35.)

Just weeks later, Mr. Berry was involved in a verbal altercation with another patient, but he was deemed not to be the aggressor and was allowed to finish attending a group session. (ECF 2 at 7.) On February 10, 2015, two days after that incident, Mr. Berry was observed in the TLC engaging in sexual activity with a female patient and was sent back to his unit. (ECF 2 at 7, 17.) The following day, Mr. Berry was again observed in the TLC common area engaging in sexual activity with a female patient and sent back to his unit. (ECF 2 at 7, 17.) He did not respond to counseling about his inappropriate behavior. (ECF 2 at 7–8.) On February 14, 2015, Mr. Berry was involved in another verbal altercation with a peer in the dining room. (ECF 2 at 8.) On February 24, 2015, Mr. Berry hit another patient in the face. After the two were separated, Mr. Berry met with the on-call psychiatrist who noted that Mr. Berry "smiled inappropriately when he was asked about the incident," and nursing staff observed him celebrating the incident with another patient. (ECF 2 at 8, 17; Tr. at 36.)

On February 27, 2015, Saint Elizabeth's social work staff noted that Mr. Berry had been involved in several verbal and physical altercations, though he was not always responsible for instigating these confrontations. (ECF 2 at 8.) However, regardless of who was the aggressor, Mr. Berry had trouble deescalating, and administrative staff at the hospital were looking to have Mr. Berry returned to the D.C. Jail following an evaluation indicating he was competent to stand

4

trial. (ECF 2 at 8.) On February 28, 2015, without any known provocation, Mr. Berry attacked another patient from behind, punching him in the face and head while he was eating. (ECF 2 at 8, 17; Tr. at 35.) Mr. Berry told staff that he attacked the peer because he did not like him. The victim of this attack reported that the two had a disagreement the day before during a group session in the TLC, but he thought the issue was over. (ECF 2 at 8, 17.) Mr. Berry was administered an emergency dose of Haldol due to this incident. (ECF 2 at 17.) On March 1, 2015, Mr. Berry approached another peer "who was quietly watching television and he attempted to physically assault him," though hospital staff intervened. Mr. Berry stated that the peer had "made a comment about his shoes while they were in the dining room for dinner that day." (ECF 2 at 8, 17.)

Because of this series of incidents, "Saint Elizabeth's Hospital administration requested Mr. Berry return to the D.C. Jail," and he was transferred there on March 4, 2015. (ECF 2 at 8–9, 17; Tr. at 35–36; *see also* ECF No. 17-6 at 198–99.) According to the Risk Assessment Panel's report, "[r]ecords indicate Mr. Berry's aggressive behaviors were increasing throughout these months, and it was noted he was targeting vulnerable patients with mental illnesses." (ECF 2 at 17.) "[A]ll of these incidents at Saint Elizabeth's Hospital involved different patient peers." (ECF 2 at 8.) Dr. Klein testified that these incidents are part of a "pattern of historical violence, as well as the sort of other antisocial behavior and violent attitudes. They are suggestive of a poor response to following the rules and following conditions that would be recommended for [Mr. Berry] to cooperate with moving forward." (Tr. at 36.)

Ultimately, in 2015, Mr. Berry was found to be competent to stand trial. He entered a guilty plea and was sentenced to 90 months in October, 2015. He was designated to FCI Cumberland in 2016, and spent much of his time there in secure housing. He was transferred to

5

other prisons during his incarceration, including being placed at high security penitentiaries in 2017. (ECF 2 at 10-11.) During most of his time in the custody of the BOP prior to his release, he was held in seclusion, often at his own arrest.

### Supervised Release and Rearrest

Mr. Berry was released from custody onto supervised release in October 2018. He returned to living with his mother, though he occasionally stayed with his brother. (ECF 2 at 11.) He began to violate supervision in May of 2019, missing urine testing, missing meetings with his probation officer, and failing to attend mental health treatment. (ECF 2 at 11.) Mr. Berry was not alleged to have committed any new offenses during this time nor been involved in violence, other than possibly being the victim of a robbery. Although he did not have a new diagnosis during this time, it appears that he was experiencing symptoms of psychosis, as his mother described he could be heard talking to himself in the bathroom. (ECF 2 at 13.) Mr. Berry was rearrested in December, 2019. Following his revocation, he was placed at FCI Schuykill, in Pennsylvania.

### FCI Schuykill

It was while he was a FCI Schuykill that Mr. Berry began to struggle more visibly with mental illness. He was quickly seen to be paranoid and anxious, with illogical thoughts and delusional ideas. Over the course of his time there, his symptoms quickly worsened. (ECF 2 at 13.) Mr. Berry feared other inmates and often sought protective custody, perseverating on a fear of being sexually assaulted. (ECF 2 at 12–13.) He also became increasingly delusional, which led to a heightened level of mental health care by prison officials. He became hyperverbal at times, and at other times extremely illogical. He also fixated on a woman named Rachel, an

6

obsession that had existed for many years.[2] (ECF 2, 12–13.) He made countless threats to any man who would get near Rachel, and was preoccupied with a plan to get her pregnant. He described his intention to shoot with an Uzi anyone else who tried to get her pregnant. He also began to respond to internal stimuli and talking and laughing in conversation with himself. Mr. Berry was transferred to FMC Rochester on April 17, 2020, for consideration for commitment pursuant to 18 U.S.C. § 4246.

**Diagnosis and Treatment at FMC Rochester**

When Mr. Berry arrived at FMC Rochester, he was housed in seclusion. (Tr. 18.) He was still fixated on Rachel, his plans to get her pregnant, and his aggression toward anyone else who might be interested in her. (ECF 2 at 19.) He was often observed talking to himself and responding to internal stimuli, though he denied experiencing any hallucinations. (ECF 2 at 19.) He ate meals, tended to his hygiene and cooperated with staff. However, his symptoms continued to worsen. He behaved in disorganized ways, spilling water in his room, shrieking frequently, covering his window with towels, and yelling about the nurses. (ECF 2 at 20.) His behavior at times verged into the sexual, at times having to be counselled about being naked while staff were nearby, staring inappropriately at female care providers, and describing that the voices in his head were being sexual. He eventually admitted to hearing voices, including Rachel's.

Despite his significant symptoms, Mr. Berry has not engaged in any violent behaviors while at FMC Rochester. (Tr. 69.)

---

[2]    The evidence in the record regarding whether Rachel is real or imagined is somewhat contradictory. Mr. Berry's mother described that he was friends with a girl named Rachel in grade school, and readily conceded that he was obsessed with her. But there is no evidence that he has had any contact with her whatsoever for well over a decade (Tr. 66), and his belief that they share a current relationship is clearly a delusion.

Mr. Berry was ultimately diagnosed with schizophrenia, a diagnosis that has been essentially uncontested throughout these proceedings. (ECF 2 at 23–24; *but see* ECF 26 at 7 (acknowledging the schizophrenia diagnosis, but stating that "Mr. Berry disagrees with this diagnosis").) Although it appears that this diagnosis was not made until his placement at FMC Rochester, it is likely that he was suffering from symptoms of this illness for several years. (Tr. 71–72.) Among the symptoms of schizophrenia with which Mr. Berry struggles are delusions, hallucinations, disorganized conduct and thoughts, and "negative symptoms" including withdrawal and a flat affect." (Tr. 23–24.)

## II.     Analysis

The Court concludes that Mr. Berry is suffering from a mental disease or defect as a result of which his release would pose a significant danger, as contemplated by 18 U.S.C. § 4246. In addition, the Court finds that no suitable state placement is available to Mr. Berry. Therefore, the Court finds that all of the statutory requirements are met in this case.

### A.     Legal Framework

"'Section 4246 provides for the indefinite hospitalization of a [federal prisoner] who is due for release but who, as the result of a mental illness, poses a significant danger to the general public.'" *United States v. Williams*, 299 F.3d 673, 676 (8th Cir. 2002) (quoting *United States v. S.A.*, 129 F.3d 995, 998 (8th Cir. 1997)). To involuntarily commit Mr. Berry under § 4246, the Court must find that the government has proved, by clear and convincing evidence: (1) that he suffers from a mental disease or defect; (2) because of his mental disease or defect, his release would cause a substantial risk of bodily injury to another; and (3) there is no suitable state placement. 18 U.S.C. § 4246; *see also United States v. Delasta*, __ F.4th __, 2021 WL 2908999 (8th Cir. July 12, 2021).

Explaining this standard, courts have recognized they are tasked with "'an awesome responsibility to the public to ensure that a clinical patient's release is safe,' … [and are] also guided by the fact that the statute imposes a high standard of proof on the Government." *United States v. Chairse*, 18 F. Supp. 2d 1021, 1025 (D. Minn. 1998) (report and recommendation of Mason, M.J., adopted by Kyle, J.) (quoting *United States v. S.A.*, 129 F.3d 995, 1000 (8th Cir. 1997)). One court considering a § 4246 commitment petition has described the evidentiary standard as follows:

> The "clear and convincing" standard is "demanding." *Spence v. Superintendent*, 219 F.3d 162, 172 (2d Cir. 2000). The Supreme Court has instructed that the standard is met only when a party can "place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.'" *Colorado v. New Mexico,* 467 U.S. 310, 316 (1984). This standard is satisfied only when "the material [one party] offered instantly tilted the evidentiary scales in [its favor] when weighed against the evidence [the other party] offered in opposition." *Id.*

*United States v. Smith*, 964 F. Supp. 2d 167, 172 (D. Mass. 2013).

Although the burden of proof is high, with its focus on "risk," the statutory standard at issue is inherently probabilistic. *Cf. United States v. Steil*, 916 F.2d 485, 488 (8th Cir. 1990) (discussing, in the context of determining the proper standard of review, that the inquiry the district court engages considers "the potential danger a [person] poses to society") (internal quotations omitted). "A finding of substantial risk under § 4246 may be based on any activity that evinces a genuine possibility of future harm to persons or property." *United States v. Dalasta*, __ F.4th __, 2021 WL 2908999 (8th Cir. July 12, 2021) (quoting *United States v. Williams*, 299 F.3d 673, 676 (8th Cir. 2002)).  This means that the government need not establish that bodily injury to others is certain to occur, but rather that there is a "genuine possibility of future harm to persons or property." *United States v. Sahhar*, 917 F.2d 1197, 1208 (9th Cir. 1990).

9

### B. Mental Disease and Defect and Absence of State Placement

Mr. Berry has essentially conceded two aspects of the government's burden of proof in this matter. First, there is no meaningful dispute in this case that Mr. Berry suffers from a mental disease or defect. Although Mr. Berry himself does not believe that he is schizophrenic (ECF 26 at 7), he offers no support for that belief and the record contains overwhelming evidence to support his diagnosis. Indeed, the Court concludes that Mr. Berry suffers from every one of the main symptoms of schizophrenia (hallucinations, delusions, disorganized thoughts, disorganized behaviors, and negative symptoms) and most likely has done so for many years. The risk assessment panel and Mr. Berry's care team at FMC Rochester unanimously adopted this diagnosis (ECF 2 at 23–25), and there is no contrary testimony or record evidence to undermine it. Sadly, schizophrenia is an uncurable condition that Mr. Berry will suffer from throughout his life, although treatment is possible. (Tr. 24.)

In addition, Mr. Berry suffers from borderline intellectual functioning, which is itself a "mental disease or defect." This diagnosis is well-supported by the record, and demonstrated by his need for special education classes, his being held back to repeat a grade twice as a child, and the results of an IQ test administered during his incarceration which placed his full scale IQ in the third percentile. (ECF 2 at 5.) Indeed, it appears that Mr. Berry's cognitive limitations were so severe that they were a main force behind the repeated findings that he was incompetent to proceed in his underlying federal case, although he may have also been suffering from early symptoms of psychosis as well.

Mr. Berry has expressly conceded that no suitable state placement exists, although he hopes that one can be arranged. (ECF 15.) This concession is also supported by the record before

the Court. And it is undisputed if Mr. Berry were not committed, he would be ordered released without any supervision. (ECF 2 at 28.)

### C. Dangerousness

The Court next finds that the government has proven by clear and convincing evidence that Mr. Berry's release would pose a substantial and unacceptable risk of bodily injury to another person or serious damage to the property of another.

**Violence, Threatening Behaviors and Risk to the Community**

The conclusion that Mr. Berry's release would give rise to a substantial risk of harm to others is supported by several aspects of the record. On its own, Mr. Berry's history of unprovoked or inexplicable violence gives rise to a substantial risk of future violence. Mr. Berry's criminal history, though short, was marked by convictions for and allegations of serious violence. The instant offense alone, which involved unwanted touching of a girl followed by the shocking and relentless use of a firearm is remarkable both for its seemingly unprovoked nature and for its extremity. Mr. Berry shot at the victims several times, continuing to walk toward the brother shooting, though he was bleeding and attempting to crawl away. And in 2011, when he was just 15, he was convicted of possessing a firearm.

In addition, Mr. Berry's violent and threatening conduct continued throughout the years between his arrest and his ultimate sentencing. As explored in detail above, between 2012 and 2015, he was frequently involved in physical confrontations with other inmates at the D.C. Jail, and other patients at St. Elizabeth's. Although some of these fights were not started by Mr. Berry, others involved him attacking others, particularly vulnerable people suffering from mental illness, without provocation. (Tr. 35–36.) Dr. Klein testified that this conduct is evidence of a pattern of historical violence which is an important factor in predicting future violence.

11

Mr. Berry argues that he does not present a risk because he has not engaged in violent behavior in several years. (ECF 26 at 7–9.) Indeed, his last documented act of aggression appears to have occurred in May, 2016. The record contains no evidence of violent conduct during the end of his first prison term, his time on supervised release, or his current placement at FMC Rochester. However, for several reasons, the Court is not persuaded that this reality undermines the clear and convincing evidence in the record that his release would pose a danger.

First, the Eight Circuit has repeatedly held that overt acts of violence are not necessary to proving future dangerousness under § 4246. *See, e.g.*, *United States v. Dalasta*, __ F.4th __, 2021 WL 2908999 (8th Cir. July 12, 2021). Even when many years have passed since the last incidence of violent behavior, a person can still be found dangerous and require commitment under § 4246. *Id.* at *3 ("The fact that a person's recent behavior has vastly improved, on its own, does not require a finding that the detainee is not dangerous.") (quoting *United States v. S.A.*, 129 F.3d 995, 1001 (8th Cir. 1997)). Controlling precedent thus clarifies that although Mr. Berry has not engaged in violent acts in several years, this reality alone does not preclude commitment. Instead, the totality of the circumstances before the Court reflects that his release would present a very real risk of harm to the community.

Most critically, Mr. Berry has been either in a very secure setting during most of that time, or on close supervised release. His interactions with others have been significantly curtailed during much of his incarceration because he has been held in seclusion; given that his troubles at St. Elizabeth's often arose due to interactions with others, the artificial isolation of his custodial settings has reduced the risk of violence in a way that would not be true were he to be released from custody without supervision. *See United States v. Williams*, 299 F.3d 673, 678 (8th Cir. 2002) (noting that Mr. Williams' more recent organized and nonviolent behavior occurred

12

while in a highly controlled prison setting). Even though Mr. Berry's lack of criminal or violent conduct while on supervised release for a year is commendable, that does not suggest that his release without any criminal-justice oversight would result in a similarly good outcome. This reality is exacerbated by the fact that the symptoms of Mr. Berry's illness are much more significant now than they were during his supervision, and his degree of disorganization is much more extreme.

Additionally, although Mr. Berry has not acted violently during his period of reincarceration, his fixations include threats of violence and give rise to a serious concern of future dangerousness. *See Dalasta*, at * 3 (noting that delusions and threats "are enough to prove dangerousness…."). His obsession with Rachel is a significant source of the Court's concern. First, this fixation is certainly sexual in nature, as he repeatedly discusses wanting to get her pregnant, and describes that she wants him to engage in other sexual acts. It is also violent, as he has threatened to kill anyone who he views as a rival for Rachel's affections. (ECF 2 at 18.) His mother reported that once, likely while he was on supervision in 2018, he ordered his uncle to kill Rachel and threatened to kill his uncle for refusing to do so. While it appears that Rachel is not really available to Mr. Berry, his relentless fixation on her and his professed willingness to use violence to keep rivals away is particularly disconcerting in light of his past criminal and sexual conduct. The offense which led to his current imprisonment involved an unwanted sexual advance to a girl who, it appears, he did not even know, followed by acts of extreme violence when confronted about his behavior. And his time at St. Elizabeth's was marked by two separate acts of sexual misconduct, though neither led to discipline. If released without treatment and supervision, it is easy to predict that his delusions about Rachel could lead to sexual acting out or violence to perceived rivals.

In sum, even though Mr. Berry's recent behavior has been less violent and less threatening that in the past, his release still presents a very significant risk of danger to the community, and the government has proven this by clear and convincing evidence.

**Lack of Insight**

The Court's conclusion about the risk Mr. Berry presents is also based on Mr. Berry's total lack of insight into his mental illness. (Tr. 44; ECF 2 at 10.) He does not believe he suffers from an illness, nor does he understand the risks posed by his behavior. (Tr. 51.) This will make it less likely that he will seek or continue with treatment if he were to be placed in the community, particularly given that he would be under no criminal justice supervision. In *United States v. Kikuyama*, 394 F. App'x 334, 335 (8th Cir. 2010), the Court found that a prisoner who suffered from ongoing delusions and lacked insight into his illness clearly presented a danger if released. *See also United States v. Luther*, 836 Fed. App'x 460 (8th Cir. 2021) (noting that "Luther has little insight into his condition," and "he likely would not continue treatment if released").

**Cognitive Impairments and Substance Abuse**

Mr. Berry's cognitive impairments also contribute to the risks his release presents. Because he struggles with processing information and understanding complex concepts, he will find it more difficult to navigate systems, get and maintain treatment, and care for himself if he is released. Although this concern alone would not merit commitment in this case, it certainly enhances the risk posed by release in light of the other factors already identified. Mr. Berry spent four years in pretrial detention, during which he was repeatedly found to be incompetent. This sad reality demonstrates the difficulty he will have managing his own affairs and staying out of trouble if released without supervision.

Additionally, the risk Mr. Berry's release presents is, according to Dr. Klein, exacerbated by his use of controlled substances, something that he may have done while on supervised release. (Tr. at 43.) The record reflects that he began using marijuana and K2 (synthetic marijuana) at age 12. The use of such substances can be a "stressor/aggravator" to mental illness. (Tr. at 74) The Eighth Circuit has often noted that a history of drug or alcohol abuse is an aggravating factor that supports commitment pursuant to § 4246. *See, e.g.*, *United States v. Honie*, 801 Fed. App'x 455, 456 (8th Cir. 2020) (noting that the "risk of [Honie's] dangerousness is exacerbated by the likelihood he would resume using alcohol and drugs if released"); *United States v. S.A.*, 129 F.3d 995, 1001 (8th Cir. 1997) (observing a risk made worse by S.A.'s history of substance abuse).

### Risk Assessment Tool

The risk panel not only carefully reviewed Mr. Berry's records, but it utilized a risk-predicting tool known as the Historical Clinical Risk Management-20 (HCR-20). This tool, admittedly which does not explore the degree to which future dangerousness is caused by mental illness, compiles 20 risk factors for future violence. (ECF 2 at 26–27.) The tool considers historical risk factors, clinical risk factors and future-looking risk-management factors. Using this framework, the risk assessment panel at FMC Rochester found that many risk factors were present for Mr. Berry including lack of insight, violent ideation, and suffering from mental illness. In fact, all ten of the backward-looking factors were present, as well as all five of the current clinical factors. (Tr. at 42.) In addition, future serious risk factors included his precarious living situation and lack of treatment or supervision. While the use of tools to assess future risk, such as the HCR-20 is subject to some criticism and the Court does not conclude that it would

support a commitment on its own, its application in this case and the clear results are an additional piece of evidence that supports the commitment of Mr. Berry.

### D. Causal Link

The government must prove that the risk of danger presented by Mr. Berry is, in fact, *caused by* his mental disease or defect. Mr. Berry argues that the government fails to meet this burden because his violent behavior occurred long before his diagnosis of schizophrenia. (ECF 26 at 7.) The Court disagrees with Mr. Berry's arguments on this point.

First, while there must be a causal link, it is settled that the evidence need not definitively tie specific past acts of violence to a mental illness to satisfy the government's burden. For instance, in *United States v. Williams*, 299 F.3d 673, 678 (8th Cir. 2002), the Court rejected Mr. Williams' very similar argument, finding a sufficient tie between his illness and the risk he presented based on the testimony of the government's expert. *See also*, *United States v. S.A.*, 129 F.3d 995, 1001 (8th Cir. 1997) (finding expert testimony that S.A.'s dangerousness was connected to his mental illness was "more than sufficient" to establish the required causal link). Here, Dr. Klein directly addressed this issue during her testimony when asked:

> So that is certainly a question we grappled with as a panel as well in terms of considering that link, because there's clearly the mental illness now. So that's essentially where we looked at what is the nature of schizophrenia as it's emerging and as it's developing and does the schizophrenia contribute to some of that early aggression and then create more risk for aggression moving forward.
>
> We do know that for persons with schizophrenia, particularly young males who have a history of impulsive behavior – who have more of history of violence and aggression – that propensity to sort of have all of those factors coincide with each other does exist and then would further associate his risk moving forward.

(Tr. at 71.) Dr. Klein went on to note that Mr. Berry may have been suffering from symptoms of schizophrenia for years before his diagnosis, and that supported her conclusion about a clear link between his mental illness and the future risk of dangerousness his release presents.

16

Dr. Klein's opinion on this topic, which is fully supported by the risk assessment panel, is uncontradicted. Moreover, it is supported by the Court's own review of the record. Although Mr. Berry did not have any diagnosis of a psychotic disorder at the time of his acting out at St. Elizabeth's, he was at one point treated with Haldol, an antipsychotic, in response to an unprovoked attack. (ECF 2 at 8.) And even though he was not yet diagnosed with schizophrenia during his earlier term of BOP imprisonment, his relentless fear that he might be attacked by other inmates is indicative of paranoia and perhaps evidences the prodromal phase of early schizophrenia about which Dr. Klein testified. Certainly, by the time he was home with his mother on supervised release in 2018, Mr. Berry was talking to himself and likely experiencing full-blown schizophrenia, although the diagnosis did not follow for a year after that.

Moreover, regardless of whether Mr. Berry's past violence can be neatly tied to past mental illness, it is a factor which supports a finding that his current release would create an unacceptable risk due to his current illness. His paranoia, his fixation on Rachel, his unwillingness to seek out treatment, the lack of structure and supervision in his future plans, his past use of weapons, and his past repeated use of extreme violence all combine to create a significant risk today.

### III.      Conclusion

The Court concludes that the government has met its burden of proving the need for Mr. Berry's commitment by clear and convincing evidence. The Court therefore recommends that the petition (ECF 1) be **GRANTED**, and Mr. Berry be committed to the custody of the Attorney General, pursuant to 18 U.S.C. § 4246.

Date: July 22, 2021

 *s/Katherine Menendez*
Katherine Menendez
United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.